**Boulevard Bridge Bank of Chicago, Trustee, Appellee, v. City of Chicago, Appellant.**

**Gen. No. 39,498.**

Heard in the second division of this court for the first district at the June term, 1937. Opinion filed February 23, 1940.

BARNET HODES, Corporation Counsel, for appellant; QUIN O'BRIEN, ALEXANDER J. RESA, JOHN W. McCARTHY and ARTHUR CHITTICK, Assistant Corporation Counsel, of counsel.

URION, BISHOP & SLADKEY, of Chicago, for appellee; HOWARD F. BISHOP and WILLIAM McKINLEY, both of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

These consolidated causes were actions for damages to two parcels of improved real estate by reason of the construction of the North Wabash avenue (formerly named Cass street) viaduct. The causes were heard by the court without a jury. In cause No. 536044 judgment was entered in favor of plaintiff in the sum of $25,000. This cause involved damages to the building referred to in the record as the "F" building. In cause No. 536045 judgment was entered in favor of plaintiff in the sum of $45,000. This cause involved damages to the building referred to in the record as the "A" building.

Plaintiff filed a motion in this court to transfer the cause to the Supreme Court. We reserved decision upon this motion until the hearing of the cause. The

motion will be denied. (See *Grunewald v. City of Chicago*, 371 Ill. 528.)

The Chicago and North Western Railway Company owned a right of way, covered by railroad tracks, along the north bank of the Chicago river and from the river north to practically Kinzie street, an east and west highway. The right of way had been there for many years, was part of the main freight line of the railway company, and extended eastward to what is known as Odgen Slip. North of Kinzie street the territory affected by the improvement in question was intersected by three east and west streets: Austin avenue, one block north; Illinois street, two blocks north; and Grand avenue, three blocks north. Plaintiff's buildings are two warehouses facing south on Austin avenue. One, a 7-story brick building, referred to as "A" building, is situated on the northeast corner of Austin avenue and North Wabash avenue. Its width on Austin avenue is 60 feet, and its length, on North Wabash avenue, is 109 feet. The other, a 6-story brick building, known as "F" building, is the second building west of North Wabash avenue. It has a frontage on Austin avenue of 50 feet, and extends 100 feet to an alley in the rear. "A" building is also designated in the record as "7 story brick Monarch Refrig." "F" building is also designated as "6 story brick Monarch Refrig." The Wabash Avenue Bridge Plan called for the construction of a bridge over the Chicago river at Wabash avenue to connect with a viaduct or elevated highway to extend northward over the Chicago and North Western Railway Company's tracks and three east and west streets, the viaduct to reach the ground level of North Wabash avenue at Grand avenue. In order to provide for a sufficient clearance for the lower level highway, North Wabash avenue was to be gradually lowered so that its new grade at Austin avenue would be 2½ feet lower than the old one, at the northern extremity of "A" building it would be

an additional 3 feet lower, and at Illinois street it would be depressed 7 feet below its level at Austin avenue. The plan also provided that from points 82 feet east and 82 feet west of Wabash avenue Austin avenue should slope toward Wabash avenue, the depression of Austin avenue at Wabash avenue to be approximately 2½ feet. The plan provided that on each side of Wabash avenue between the building line on the north side of Austin avenue and a point opposite the north end of "A" building there should be a row of three caissons, those on the east side to be approximately 18 feet from the wall of "A" building. These caissons went down to bedrock, 70 or 75 feet below city datum. The old street level in Wabash avenue was 14½ to 15 feet above city datum. As the Illinois tunnel ran north and south along the center of Wabash avenue about 70 feet below the surface, the plan called for supporting beams of steel and concrete, referred to as girders, extending east and west from caisson to caisson, with a vertical column resting thereon that supported the viaduct near the center of North Wabash avenue.

The elements of damages claimed by plaintiff were: (1) That in the construction of the viaduct the City was liable for interference with lateral support, which interference resulted in the sinking of the foundations, columns and walls of the two buildings, which in turn resulted in damage to the walls, floors, insulation, etc. (2) That plaintiff's tenant, Monarch Refrigerating Company, by reason of the change of grade of streets, was put to an expense of $6,795.95 for emergency work in the relocation of piping, wiring, conduits, ammonia lines, etc., which was charged against plaintiff. (3) That prior to the improvement "A" building had a shaft that led from said building down under Wabash avenue to the Illinois tunnel, that one of the caissons on the east side of Wabash avenue cut into this shaft, that thereafter it could not be used, and that it would

cost approximately $30,000 to install a new shaft. (4) That prior to the change of grade of Wabash avenue the Wabash avenue side of ''A'' building received daylight, but that after the viaduct was constructed the windows on the first floor of that side were darkened. (5) That the change of the grade in Wabash avenue greatly interfered with the loading facilities of both buildings; that three pillars installed in the center of Wabash avenue opposite ''A'' building decreased the number of trucks that could unload on that side of ''A'' building at one time, and that the sloping of the alley back of ''F'' building made unloading there more difficult than it was before. (6) That the closing of North Wabash avenue on the north side of Illinois street constituted an element of damage.

As to claim (1): Defendant concedes a settlement of the buildings, but it contends that ''the City is not liable for the settlement of the buildings,'' because nothing that it did in constructing the viaduct caused either building to settle, and that ''the settlement of these buildings was due to overloading.'' The trial court found that the construction of the viaduct caused the settlement of the two buildings, and after a careful examination of the evidence bearing upon this claim we are satisfied with his finding in that regard. Witnesses for plaintiff testified that before the work of constructing the viaduct commenced the floors of the buildings were practically level and in good physical condition, the columns in good shape and plumb, and that there was no evidence of settlement or cracking; that after the construction work the floors of ''A'' building were badly out of level, the columns badly out of plumb, and there was a general tendency of the building to pull westward; that a later examination showed considerable settlement in the building and many evidences of separation and cracking; that an examination of ''F'' building, after the construction work, showed that it had settled toward the east, viz.,

toward Wabash avenue; that the floors were out of level, the columns out of plumb, and the joists and girders pulling. Witnesses for plaintiff also testified that the settlement of the buildings was caused by the construction of the viaduct. The manifest weight of the evidence shows that the buildings were not overloaded at any time. Counsel for defendant have made an ingenious argument in support of their claim that nothing that was done in the construction of the viaduct caused the settlement of the buildings; but, faced with the fact that something caused the settlement that followed the construction of the viaduct, they are finally forced to the position that the settlement of the buildings was caused by overloading. The trial court, in view of the evidence, was fully warranted in refusing to believe this highly improbable defense. Defendant concedes that plaintiff's evidence shows ''that because of the settling it would cost $28,345 to restore the floor levels of the 'A' building and $93,714 to restore those of the 'F' building.''

As to claim (2): Defendant contends that the evidence does not show that the amount expended by plaintiff's tenant, Monarch Refrigerating Company, was paid by plaintiff or charged to it, or that plaintiff was liable therefor, and that there can be no recovery for these expenditures in this proceeding. Plaintiff contends that during the trial of the cause there was an agreement of counsel that the only question raised as to the $6,795.95 item was, Were the work and expenditures necessary as a result of the improvement? Defendant insists that the language of the alleged agreement is meaningless and that it is not possible to determine what was intended by it. After a consideration of the language in question we think its meaning is ambiguous; but there is nothing in the record to show that the court allowed this claim, and in our view of this appeal it may be disregarded. Defendant concedes that plaintiff was not obliged to

itemize the damages and the trial court did not itemize the damages allowed, *nor was he asked to do so*.

As to claim (3) : Defendant does not dispute plaintiff's evidence that one of the caissons installed on the east side of Wabash avenue cut into the shaft that led from "A" building to the Illinois tunnel, so that the shaft could no longer be used, and that it would cost approximately $30,000 to install a new shaft, but it contended, in its original brief, that there could be no recovery for this damage because the evidence in support of the claim was not based upon any allegation in the declaration. Plaintiff answered this contention by calling attention to the fact that no objection was made to the testimony on the aforesaid ground, and further answered that certain parts of the declaration contain sufficient allegations to include the claim. The point that no objection was made to the testimony on the specific ground urged is a meritorious one; but plaintiff, in answering defendant's position, argued, "in further support" of the instant claim, that the fee of Cass street (North Wabash avenue) was in plaintiff. Both properties are included in Kinzie's Addition to Chicago, and plaintiff contends that evidence introduced by it (the plat of Kinzie's Addition to Chicago) shows that there was not a statutory dedication of Cass street, as the plat shows that there was a failure to comply with the statute regulating statutory dedications of streets and that the plat must be considered as nothing more than a common law dedication. Defendant, in its reply brief, contends that plaintiff did not prove its title to the fee in the street and the presumption is that the City owns the fee in its streets, and, therefore, plaintiff has no claim for damages to its tunnel shaft. Defendant argues with some force that this item of damages appears to have been an afterthought. After examining the evidence bearing upon plaintiff's alleged title to the fee in the street we entertain serious doubts as to whether the proof showed only a common law dedication, but there is

nothing in the record to show that the trial court allowed damages for the instant claim, and in our view of this appeal the claim may be disregarded, although it is clear that plaintiff suffered substantial damages by the destruction of its shaft to the Illinois tunnel.

As to claim (4): The witness Horning, auditor for the Monarch Refrigerating Company, testified: ''It is impossible for any daylight to be admitted from the Wabash avenue side. The daylight is now admitted from the Austin avenue side but it doesn't penetrate to any except Mr. Eckert's private office. Now we need artificial light all day and we used to need artificial light only in the winter months and in the latter part of the afternoons.'' The witness's testimony pertained to ''A'' building. Defendant does not contend that loss of light is not an element of damage that may be considered in a case of this kind, but it argues that ''the evidence of the plaintiff made the problem of determining the amount of damages a matter of pure guesswork. In such a case no more than nominal damages could be recovered in any case.'' The real estate experts who testified for plaintiff gave this loss of light as one reason, among others, for the damages they claim plaintiff sustained. Defendant, upon cross-examination, did not ask them to separate the various elements of damages. What damages, if any, the trial court allowed for loss of light does not appear from the record.

As to claim (5): Defendant does not contend that interference with the loading facilities of the two buildings does not constitute an element of damage. It does contend that ''there is no sufficient proof of damages to either building by reason of interference with loading facilities.'' The trial court did not agree with this contention. Nor do we. Witness Horning testified that ''the effect of the seasonable requirements is that we need all the loading and unloading facilities we can possibly get. . . . Perishable goods must be delivered or received.'' He also stated that the capacity of the

premises prior to the change of grade was six trucks along East Austin avenue and eleven trucks along North Wabash avenue; that "they don't go much on the upper level of North Wabash avenue. If they go on the upper level of Wabash avenue they either have to go west on Austin avenue and take Wells street such as will permit trucks to pass and they have to go underneath Michigan avenue to Wacker Drive and to the level that will permit trucks." Frank Quirk, a trucking contractor, testified: "We would have 15 to 20 cars there a day sometimes loading from the Monarch plant going to the North Western"; that he had no occasion to use the upper level as it would be six blocks out of his way, and "we have never used the upper level. Since the construction of this viaduct we cannot unload on the Wabash avenue side at all of the Monarch property because of the pillars and girders in there on the sidewalk. We could not even put the trucks in there. There are big girders all along the sidewalk. On Austin avenue we cannot unload or load because of the slant there and then we have to go back"; that since the viaduct construction he could "only back one truck in there at a time, leaving other trucks at peak times out in the street so that you could not get everything in in one day," and "before August 1, 1930, we could back about 8 or 10 trucks in there. . . . I don't let them back in there because of the slant which caused them to pile the eggs up all over. . . . Because of the slope on the 60 feet of Austin avenue, we can't put two trucks there and load them." Hickey, the tenant's superintendent, testified: "After the construction of the viaduct we can't get around there on the Cass street side at all. . . . At the present time the street there is so low that you can't back in on account of those columns and; if you put a truck in there nobody can pass, and if you put trucks in on both sides the street is wholly blocked on account of the center columns." Clausen, an engineer, analyzed

the trucking situation at the premises after the viaduct was built. In his testimony appears the following: "If the City would allow us to unload or load in the upper level with the average truck of 15 feet it would interfere with both the northbound motor traffic and the street cars which pass there every 3 minutes. . . . Therefore, you could not load the breakable merchandise on Wabash avenue because you would have to lift it up 3 feet. At the north end of Building A on Wabash, the floor of the truck would be 2½ feet lower than the sidewalk and 3½ feet with the hand truck, from the sidewalk to the floor of the truck would be 2 feet on the average small truck." Beardsley testified as to the trucking facilities which the two properties enjoyed before the building of the viaduct, and how important it was to have uninterrupted access on North Wabash avenue to Austin avenue. He further testified: "Because of this depression trucks cannot come up Cass street [North Wabash avenue] frontage without being obliged to lift heavy loads as high as 3 feet on to the warehouse trucks," and "in addition, it has the alley in the rear, a very abrupt slope down into Wabash avenue lower level making it almost unusable for trucking operations." The trial court could justly find that plaintiff sustained substantial damages by reason of interference with the loading facilities. What damages the trial court allowed for the interference with the loading facilities does not appear.

As to claim (6): North Wabash avenue on the north side of Illinois street is now closed on the lower level. Plaintiff claims that the usual route of travel for vehicles going north from plaintiff's properties would be on the lower level of North Wabash avenue. After going a half block north on Wabash avenue from plaintiff's properties a driver of a vehicle is now confronted with a solid wall, which bars any further progress to the north and makes it necessary for the vehicle to go either to the east or to the west before proceeding

north. Defendant contends that the closed portion of Wabash avenue is not in the same block in which plaintiff's property is situated and that under the law of this State plaintiff is not entitled to recover damages for the said closing. Plaintiff claims that under the ruling in *Davis v. City of Chicago*, 290 Ill. App. 244 (petition for leave to appeal denied by the Supreme Court, ib. xv), it is entitled to damages for the said closing. Plaintiff, however, states that there is nothing to show that the trial court allowed any damages for the said closing, and that the amounts of the judgments allowed can be justified by the elements of damage that plaintiff was clearly entitled to. In our view of this appeal we may disregard claim (6). The said closing, however, is one of the circumstances that tends to show that the construction of the viaduct was not designed to benefit plaintiff's properties.

Witnesses for plaintiff and defendant gave their appraisal of the value of the two properties before and after the construction of the viaduct. Two of plaintiff's witnesses testified that the value of the land and improvement of "A" property after the building of the viaduct was approximately $100,000 less than the value before the improvement. Plaintiff's third witness testified that the value of the land and improvement of "A" property after the building of the viaduct was $79,625 less than the value before the building of the viaduct. The witnesses for defendant testified that the "A" property *increased* in value after the improvement between $13,000 and $14,000. One expert witness for plaintiff testified that the total loss on the land and building of "F" property after the building of the viaduct was $45,833. Another testified that the total loss was $66,750. Another testified that the total loss was $58,400. Defendant's expert witnesses testified that the value of the land and improvement of the "F" property after the construction of the viaduct was the same as it was before the con-

struction. This expert evidence illustrates clearly how difficult it is to determine the damages in actions like the instant one, where the determination must be based upon the testimony of experts, alone. Fortunately, in the instant case the trial court had other evidence to aid him in reaching his judgment. That the trial court gave little, if any, weight to the testimony of defendant's expert witnesses upon the subject matter of values, may well be assumed. That he took the testimony of plaintiff's experts "with a grain of salt" is indicated by the amount of the damages awarded.

We find no merit in defendant's contention that "both the 'A' and 'F' properties were benefited by this public improvement." As plaintiff argues, defendant was forced to adopt a plan for the public work in question that precluded any benefit to plaintiff's properties. The viaduct structure did not come down to the surface until it reached Grand avenue because it was necessary to provide sufficient clearance over the railway company's tracks. To obtain the right to build this viaduct through and over the railway company's property it would have been necessary to resort to condemnation proceedings if the right of way had not been acquired by a settlement between the railway company and defendant, the terms of which are incorporated in the ordinance providing for the improvement. A reading of the ordinance makes it clear that the extension of the viaduct past plaintiff's properties was caused solely by the railroad right of way, which made it impossible to begin the approach to the bridge at the old level of North Wabash avenue at East Kinzie street. A civil engineer employed by defendant testified that but for the railroad right of way the viaduct would have come down to the old street level at approximately East Kinzie street. He also testified that prior to the building of the viaduct North Wabash avenue (formerly Cass street) terminated at Kinzie street because the railroad tracks and yards "were

down there.'' The result of constructing the public work as planned undoubtedly cost the City less than it would have had to pay the railway company in case of condemnation proceedings, for had the City been compelled to resort to such proceedings the damages suffered by the railway company would have been very large. The City, to minimize damages, wisely made an agreement with the railway company, but it is clear that plaintiff suffered damages to its properties as the result of the agreement. The construction of the Wabash avenue bridge is a great benefit to the people of this community. It undoubtedly benefited certain properties in the Loop and properties on Wabash avenue north of Grand avenue. Had the viaduct come down to the old street level of Wabash avenue near Kinzie street, plaintiff's properties would also have been benefited. Several of the expert witnesses for defendant testified that since the building of the bridge and viaduct the use of plaintiff's properties is not limited to cold storage warehouses, but that some space in the buildings could be used for retail stores which would earn for the properties greater rentals. One of defendant's experts testified that the properties might now be used for light manufacturing. On the contrary, testimony for plaintiff shows that the warehouse use is still the highest and best use that can be made of the properties, and that the cost of changing and remodeling the buildings to conform to the changes advocated by defendant's experts would be prohibitive.

The able and experienced trial judge saw the witnesses and heard their testimony, and had a better opportunity than we have to pass upon their credibility and the weight that should be attached to their testimony. In addition, *he examined the premises.* If all of the doubtful elements of damages claimed by plaintiff are disregarded, nevertheless, the amounts allowed by the trial court are no more than sufficient to compensate plaintiff for damages done its properties by rea-

son of the improvement. After a careful study of the record we see no good reason why defendant should complain of the amounts of the judgments. Section 13 of Article II of the Constitution of 1870 provides that "Private property shall not be taken or damaged for public use without just compensation." In *People ex rel. Farwell v. Kelly*, 361 Ill. 54, 58, the court quotes with approval the following from *Roe v. County of Cook*, 358 Ill. 568: "The constitutional right of all property owners to compensation when their property has been damaged or taken for public use is one of the most salient provisions of our bill of rights," and states (p. 59): "The provisions of section 13 of article 2 of the constitution are self-executing, neither requiring any legislation for their enforcement nor susceptible of impairment by legislation or ordinance. (*Roe v. County of Cook, supra*, and authorities there cited.)"

The judgments of the superior court of Cook county in causes No. 536044 and 536045 are affirmed.

*Judgments affirmed.*

SULLIVAN, P. J., and FRIEND, J., concur.